UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LEON PLOTTS #864613,

               Petitioner,                             Hon. Janet T. Neff

v.                                             Case No. 1:17-CV-448

SHIRLEY HARRY,

               Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Plotts' petition for writ of habeas corpus.   In accordance with 28 U.S.C. § 636(b), the undersigned recommends that Plotts' petition be **denied**.

## BACKGROUND

        Petitioner was charged in this matter with five counts of first degree criminal sexual conduct and two counts of second degree criminal sexual conduct.   (Trial Transcript, January 2, 2013, at PageID.443-44).   Numerous individuals testified at Petitioner's jury trial.   The relevant portions of their testimony are summarized below.

**I.**        **Prosecution Witness**

**Larry Baker**

        Larry Baker and Shannon Baker were previously married for approximately eight years during which time the couple had two daughters, K.B. and K.L.B.   (Trial Transcript, January 2, 2013, at PageID.503-04).   As of June 2012, Shannon Baker, who was at the time cohabitating

with Petitioner, had custody of K.B. and K.L.B.    (Trial Transcript, January 2, 2013, at PageID.504-06).

On June 3, 2012, K.B. and K.L.B. were visiting Larry Baker.  (Trial Transcript, January 2, 2013, at PageID.506).   When Baker instructed K.L.B. to "get her stuff ready because her mom was coming to pick her up," K.L.B. began crying.   (Trial Transcript, January 2, 2013, at PageID.506).   K.L.B. said she "didn't want to go home" because Petitioner "touched" K.B. "in the naughty spot."   (Trial Transcript, January 2, 2013, at PageID.507).   Baker then spoke with K.B. who confirmed her sister's statement.   (Trial Transcript, January 2, 2013, at PageID.507).  Larry Baker then contacted the police.   (Trial Transcript, January 2, 2013, at PageID.507-08).

**Shannon Baker**

Baker lived with Petitioner for "about" three years in a home Petitioner owned. (Trial Transcript, January 2, 2013, at PageID.521).   When the police informed Baker of K.B.'s allegations against Petitioner, Baker was initially "in denial."   (Trial Transcript, January 2, 2013, at PageID.524-26).   Baker's mind was changed, however, after K.B. "sat down and told [Baker] everything" and that what Petitioner had done to her "was more than touching."   (Trial Transcript, January 2, 2013, at PageID.526).   Prior to K.B. disclosing what Petitioner had done to her, Larry Baker had never communicated to Shannon that he did not want his children associating with Petitioner.   (Trial Transcript, January 2, 2013, at PageID.522-23).

**K.B.**

K.B., born in September 2001, described various incidents in which Petitioner digitally penetrated her vagina, made contact manually and orally with her breasts, and forced her to perform oral sex.   (Trial Transcript, January 2, 2013, at PageID.541-53).   K.B. tried to tell her mother about Petitioner's behavior, but K.B. "didn't want to make her [mother] sad and stuff."

2

(Trial Transcript, January 2, 2013, at PageID.559).   K.B. was also concerned that her mother would not believe her.   (Trial Transcript, January 2, 2013, at PageID.560).

**A.H.**

A.H.'s mother, Kimberly Baron, was previously married to Petitioner.   (Trial Transcript, January 2, 2013, at PageID.574-75).   A.H. was approximately nine years of age when her mother married Petitioner.   (Trial Transcript, January 2, 2013, at PageID.575).   A.H. once surreptitiously observed Petitioner assault her younger sister by "biting her breasts and touching them."   (Trial Transcript, January 2, 2013, at PageID.576-77).

**Kimberly Baron**

Baron was married to Petitioner for fifteen years.   (Trial Transcript, January 2, 2013, at PageID.587).   After learning from her daughter, A.H., that Petitioner had assaulted her younger sister, Baron confronted Petitioner.   (Trial Transcript, January 2, 2013, at PageID.588-89).   Petitioner denied A.H.'s allegations and asserted that A.H. was instead describing something that had happened to "a friend [of A.H.'s] that was being molested at the same time."   (Trial Transcript, January 2, 2013, at PageID.589-90).   Baron stated that she did not contact the police because she first wanted more proof.   (Trial Transcript, January 2, 2013, at PageID.590-91).

**Melissa Peterson**

As of July 2012, Peterson was employed as a Therapist and Medical Coordinator for the Children's Advocacy Center in Muskegon, Michigan.   (Trial Transcript, January 3, 2013, at PageID.608-13).   In July 2012, Peterson met with K.B. to perform an "interview and medical examination."   (Trial Transcript, January 3, 2013, at PageID.613).   K.B. told Peterson that Petitioner had digitally penetrated her vagina and forced her to perform oral sex.   (Trial

Transcript, January 3, 2013, at PageID.616-17).   The results of Peterson's examination were not

inconsistent with K.B.'s allegations.   (Trial Transcript, January 3, 2013, at PageID.617-23).

Peterson indicated that there exist "a lot" of reasons why victims do not report abuse

perpetrated by "someone close to them."   (Trial Transcript, January 3, 2013, at PageID.626).   For

example, "a lot of them are scared, a lot of them are scared they won't be believed, that people

will be mad at them, [or] that they'll tear apart the family."   (Trial Transcript, January 3, 2013, at

PageID.626).   Peterson also indicated that victims of sexual abuse are oftentimes able to

compartmentalize the improper behavior.   (Trial Transcript, January 3, 2013, at PageID.627).

Specifically, Peterson noted:

> They can take the bad, the abuser part of the person and put that
> away from the rest of the person.   There's the good part of the
> person and then there's the abuser part of the person.   It would be
> like we separate the alcoholic away from the non-alcoholic or the
> domestic violence person away from the other person.   They can
> just take the good with the bad.   You take the bad mommy away
> from the good mommy or the bad daddy away from the good daddy.
> It's, you know, you got to take, you know, there's got to be – there's
> the good person as well as the bad person and they have to hold on
> to the good person for whatever reason that may be.

(Trial Transcript, January 3, 2013, at PageID.627).

Peterson conceded that some of the "details" provided to her by K.B. differed from

statements she later made to others, but Peterson disputed that such constituted "inconsistencies."

(Trial Transcript, January 3, 2013, at PageID.639-45).   As Peterson described it, "disclosure is a

process" which she described thusly:

> That they don't disclose everything they have all at once; it comes
> over time.   As time goes on more and more information is divulged.
> Especially if something went on, like she said, this started when she
> was nine and ended when she was ten.   There [were] multiple
> events.   Different things are going to come out.   You know, more
> and more information is going to come out as – especially as she's
> in therapy more and more information is going to come out about

4

things that happened.   And as she feels more comfortable talking to someone more and more information is going to come out.

(Trial Transcript, January 3, 2013, at PageID.645-46).

**Karen Buttleman**

Buttleman has been friends with S.P. for eight years and knew that Petitioner had been her step-father.   (Trial Transcript, January 3, 2013, at PageID.649).   Buttleman spoke with S.P. after Petitioner was charged with sexually assaulting K.B.   (Trial Transcript, January 3, 2013, at PageID.650-53).   During this conversation, S.P. shared something about herself and Petitioner after which S.P. just began "sobbing."   (Trial Transcript, January 3, 2013, at PageID.653-55). When Buttleman suggested to S.P. that she contact the police, S.P. responded, "I can't, I'm ashamed, I'm embarrassed."   (Trial Transcript, January 3, 2013, at PageID.655-56).   So, Buttleman "called the authorities" herself.   (Trial Transcript, January 3, 2013, at PageID.656).

**S.P.**

S.P.'s mother, Kimberly Baron, married Petitioner when S.P. was a young child. (Trial Transcript, January 3, 2013, at PageID.659-60).   When S.P. was approximately eleven years of age, Petitioner began sexually assaulting her.   (Trial Transcript, January 3, 2013, at PageID.660).   Petitioner continued doing so for "a few years."   (Trial Transcript, January 3, 2013, at PageID.660-61).   Baron worked third shift at the time and Petitioner would enter S.P.'s room "in the middle of the night and pull [her] pants down and get on top of [her] and stick his penis in [her] vagina."   (Trial Transcript, January 3, 2013, at PageID.661-62).   Petitioner did this on multiple occasions.   (Trial Transcript, January 3, 2013, at PageID.662-63).   Petitioner also inserted his penis into S.P.'s anus and digitally penetrated her vagina.   (Trial Transcript, January 3, 2013, at PageID.663-64).

When Baron asked S.P. if Petitioner was "touching" her, S.P. responded, "yes." (Trial Transcript, January 3, 2013, at PageID.665-66).   However, when Baron failed to contact the police or other authorities, S.P. just concluded that her mother did not believe her, "so [S.P.] just had to try to forget about it."   (Trial Transcript, January 3, 2013, at PageID.666).   S.P. did not consider contacting the police herself because she "felt like [she] had nobody to support [her] because [her] mom didn't believe [her]."   (Trial Transcript, January 3, 2013, at PageID.667).

A "number of years" later, in 2002, S.P.'s brother "made a report" after which a police officer "stopped by the house" and asked S.P., in Petitioner's presence, whether Petitioner had "touched her."   (Trial Transcript, January 3, 2013, at PageID.668).   S.P. lied and answered, "no," because, as S.P. stated, "I didn't have my mom's support and I felt like my mom was happy so I just felt like it would be all my fault."   (Trial Transcript, January 3, 2013, at PageID.668-69). S.P. just "blocked out the bad parts" about Petitioner and continued to have "a friendly relationship" with him.   (Trial Transcript, January 3, 2013, at PageID.669-70).   S.P. eventually told Karen Buttleman what Petitioner had done to her and eventually spoke with Michigan State Trooper Chris Boven.   (Trial Transcript, January 3, 2013, at PageID.670-73).

**Chris Boven**

As of June 3, 2012, Boven was employed as a Michigan State Trooper.   (Trial Transcript, January 3, 2013, at PageID.690-92).   On this date, Boven was dispatched to Larry Baker's residence to investigate a complaint of criminal sexual conduct.   (Trial Transcript, January 3, 2013, at PageID.691-92).   When Boven arrived, he spoke with Larry Baker who related that his daughter, K.B., stated that Petitioner had touched her inappropriately.   (Trial Transcript, January 3, 2013, at PageID.692-93).

Boven then spoke with K.B. inside Larry Baker's residence.  (Trial Transcript, January 3, 2013, at PageID.694).   While this was not the "ideal" environment in which to speak with K.B., Trooper Boven was concerned that if he waited to speak with K.B., she "would then be going back to the house where this alleged suspect is" which he considered unacceptable.   (Trial Transcript, January 3, 2013, at PageID.695-96).   After discerning that K.B. understood the difference between the truth and a lie, Boven asked K.B. if she knew why he was there to speak with her, to which K.B. responded that Boven "was there to talk to her about [Petitioner]."   (Trial Transcript, January 3, 2013, at PageID.696-98).   K.B. then described to Boven an incident in which Petitioner sexually assaulted her.   (Trial Transcript, January 3, 2013, at PageID.699-700). As Trooper Boven described it:

> [K.B.] described an instance that she was sitting on the couch and [Petitioner] was also sitting on the couch, and at some point she described that he reached between her legs and touched her in her crotch, private area.   And she got up and told [Petitioner]; don't do that again, and she stated that he said he wouldn't, so he sat down next to her again, he touched her again in the same area, and she got up and described that she had left and went and told her sister.

(Trial Transcript, January 3, 2013, at PageID.699-700).

Trooper Boven then contacted Child Protective Services to "make sure the children are safe while the criminal investigation is ongoing."   (Trial Transcript, January 3, 2013, at PageID.701).   Boven then made arrangements to speak with Petitioner.   (Trial Transcript, January 3, 2013, at PageID.701).

When Boven asked Petitioner if he knew why the pair were speaking, Petitioner stated that "it was in regards to [K.B.], and he made the statement that there was some sort of tickle issue that he may have touched her inadvertently."   (Trial Transcript, January 3, 2013, at PageID.704-05).   Petitioner also "blamed a lot of things on Larry Baker, on how he was a drinker, and that other things were getting put in [K.B.'s] head, and that people were coaching her to say

what – coaching her what to say to me or anybody that made contact or in regards to it."   (Trial Transcript, January 3, 2013, at PageID.705).   When Boven asked Petitioner about allegations that Petitioner "was having sexual intercourse" with S.P., Petitioner responded, "the police came out and [S.P.] denied it, and that if he had done it why was she still hanging around him, and that he wouldn't do that type of stuff."   (Trial Transcript, January 3, 2013, at PageID.705-06).

When Boven asked Petitioner how he thought this matter would turn out, Petitioner stated, "I'm going to prison and they are going to find me guilty."   (Trial Transcript, January 3, 2013, at PageID.706).   This struck Boven as "very telling" because in his experience, an "innocent person" will respond to such a question by proclaiming their innocence.   (Trial Transcript, January 3, 2013, at PageID.706).   Boven then asked Petitioner whether a person who "touches a ten-year-old girl like this" should go to prison or receive psychological counseling, Petitioner responded, "they should get some psychological help."   (Trial Transcript, January 3, 2013, at PageID.706-07).   Trooper Boven interpreted Petitioner's response as incriminating because "somebody that may have something to do with it is actually going to describe themselves when they are talking about getting help, jail, prison, or death, and obviously he doesn't want to see himself go to prison so he'll put himself at the lowest level."   (Trial Transcript, January 3, 2013, at PageID.707).

On July 9, 2012, K.B. was interviewed a second time at a child advocacy facility. (Trial Transcript, January 3, 2013, at PageID.713-14).   Boven did not participate in this interview, but instead watched it via closed circuit television.   (Trial Transcript, January 3, 2013, at PageID.714).   During this interview, K.B. "disclosed more information in regards to sexual touching and some sexual penetration as well."   (Trial Transcript, January 3, 2013, at PageID.714).   This did not surprise Trooper Boven because in his experience, "it's common. .

8

.where a little bit will come out and then further information will come out later on."  (Trial Transcript, January 3, 2013, at PageID.714).

>          After this interview, Trooper Boven interviewed Petitioner a second time on July 14, 2012.  (Trial Transcript, January 3, 2013, at PageID.714).   Petitioner continued to deny any wrongdoing and instead "gave multiple excuses" to explain K.B.'s allegations.  (Trial Transcript, January 3, 2013, at PageID.714-15).   Petitioner told Boven that K.B. "is a ten-year-old with a mind of a five-to-six-year-old, and that sometimes she has dreams and it would be very difficult to convince her that they weren't true."  (Trial Transcript, January 3, 2013, at PageID.715). Petitioner "blamed Larry [Baker] for touching her."  (Trial Transcript, January 3, 2013, at PageID.716).   Petitioner asserted that Larry Baker was "putting the words in her mouth telling her what to say."  (Trial Transcript, January 3, 2013, at PageID.716).   Petitioner also claimed that Larry Baker "never liked him."  (Trial Transcript, January 3, 2013, at PageID.716-17). Petitioner than stated that "it's possible [K.B.] learned it at school."  (Trial Transcript, January 3, 2013, at PageID.717-18).   Petitioner then speculated that K.B. and her sister "had conspired against him to get him in trouble so that the mom and dad would get back together."  (Trial Transcript, January 3, 2013, at PageID.719).

>          At one point in the interview, Trooper Boven "pointed right at" Petitioner and stated, "you did it, and I know you did it," in response to which Petitioner "sat there with his legs crossed, with his hands folded, and he looked at the ground."  (Trial Transcript, January 3, 2013, at PageID.722-23).   Petitioner later spontaneously stated that "if he was going to molest a child he would do it late at night when they are sleepy and groggy and they wouldn't know what was going on."  (Trial Transcript, January 3, 2013, at PageID.726).

II.            **Defense Witnesses**

**Kelli Proctor**

Kelli Proctor is Petitioner's daughter and S.P.'s step-sister.   (Trial Transcript, January 3, 2013, at PageID.741-42).   Proctor did not believe S.P.'s allegations against Petitioner because "nobody that has been molested lives with somebody and calls them dad for twenty years." (Trial Transcript, January 3, 2013, at PageID.742).   According to Proctor, Petitioner and S.P. had an "ordinary" father/daughter relationship.   (Trial Transcript, January 3, 2013, at PageID.742-43).

When Petitioner divorced S.P.'s mother, S.P. lived with Petitioner.   (Trial Transcript, January 3, 2013, at PageID.743).   When Petitioner told S.P., who was 25 years of age at the time, that she had to move out, S.P. was upset.   (Trial Transcript, January 3, 2013, at PageID.743-44).   S.P. was also "jealous" of Shannon Baker because she "got [Petitioner's] attention" and S.P. "wasn't getting [Petitioner's] attention no more."   (Trial Transcript, January 3, 2013, at PageID.746).   Proctor conceded, however, that there was no amount of evidence that would persuade her that her father "likes to touch young girls."   (Trial Transcript, January 3, 2013, at PageID.752-53).

**M.P.**

M.P. is a younger brother to S.P..   (Trial Transcript, January 3, 2013, at PageID.756).   M.P. never witnessed Petitioner entering S.P.'s room at night as she alleged and doubted that Petitioner could have done so without somebody noticing.   (Trial Transcript, January 3, 2013, at PageID.759).   S.P. never reported being molested by Petitioner.   (Trial Transcript, January 3, 2013, at PageID.759-60).

**C.P.**

C.P. is Petitioner's son and grew up in the same household with A.H., S.P., and M.P. (Trial Transcript, January 3, 2013, at PageID.767-68).   C.P. "would have known" if Petitioner had been sneaking into S.P.'s room as she alleged.   (Trial Transcript, January 3, 2013, at PageID.768-71).   S.P. accused Petitioner because "she's money hungry" and was upset about certain financial decisions Petitioner made to her detriment.   (Trial Transcript, January 3, 2013, at PageID.771-72).   S.P. was also "jealous" of Shannon Baker.   (Trial Transcript, January 3, 2013, at PageID.772-73).   C.P. conceded, however, that there was no amount of evidence that would persuade him that Petitioner committed the crimes in question.   (Trial Transcript, January 3, 2013, at PageID.776).

**Brent Crawford**

Brent Crawford had been friends with Petitioner for 20-25 years.   (Trial Transcript, January 3, 2013, at PageID.778).   During this time, he and Petitioner often went racoon hunting at night with Crawford's young daughters.   (Trial Transcript, January 3, 2013, at PageID.778-79). Petitioner never acted inappropriately with Crawford's daughters.   (Trial Transcript, January 3, 2013, at PageID.779-80).

**Krystal Plotts**

KP is Petitioner's daughter.   (Trial Transcript, January 3, 2013, at PageID.785). S.P. and A.P. never said anything to her that suggested Petitioner was engaging in any improper conduct.   (Trial Transcript, January 3, 2013, at PageID.786-87).

**Tammy Provenzano**

Petitioner and Provenzano were neighbors for more than 15 years.   (Trial Transcript, January 3, 2013, at PageID.791-92).   According to Provenzano, Petitioner is "a good

guy" who plowed her mother's driveway.   (Trial Transcript, January 3, 2013, at PageID.793).

Provenzano conceded, however, that she "didn't spend time at [Petitioner's] house."   (Trial

Transcript, January 3, 2013, at PageID.794).

**III.**          **Prosecution Rebuttal Witnesses**

**A.H.**

        In response to the testimony that Petitioner was not the type of person who would

sexually assault young girls, A.H. stated that "they have different opinions."   (Trial Transcript,

January 3, 2013, at PageID.796-97).   A.H. then described an incident in which Petitioner

attempted to assault her.   (Trial Transcript, January 3, 2013, at PageID.797).   A.H. reported this

to her mother the following day, after which Petitioner make no further attempts to touch or assault

her.   (Trial Transcript, January 3, 2013, at PageID.797-98).

        Following the presentation of evidence, the jury found Petitioner guilty of two

counts of first degree criminal sexual conduct and two counts of second degree criminal sexual

conduct.   (Trial Transcript, January 4, 2013, at PageID.847-48).   Petitioner was sentenced to

serve 25-70 years on each first degree criminal sexual conduct conviction and 5-15 years on each

second degree criminal sexual conduct conviction.   (Sentencing Transcript, February 19, 2013, at

PageID.863-65).   Petitioner subsequently appealed his conviction in the Michigan Court of

Appeals, asserting the following claim:

> I.     The trial court erred in denying the motion for new trial based on
>        Appellant's claim that trial counsel was constitutionally ineffective and that
>        his constitutional right to effective counsel was violated.
>
>        A.     Counsel was ineffective for failing to object to the testimony of
>        Melissa Peterson and Trooper Chris Boven concerning the one of victim's
>        out-of-court statements.

B.    Counsel was ineffective for failing to hire an expert witness to explain why the alleged victims would falsely accuse Petitioner of sexual assault.

C.    Counsel was ineffective for failing to move to sever his joint trial.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Plotts*, 2015 WL 4751154 (Mich. Ct. App., Aug. 11, 2015).   Raising the same issues, Petitioner appealed the matter to the Michigan Supreme Court which likewise affirmed his conviction.  *People v. Plotts*, 877 N.W.2d 731 (Mich. 2016).   On March 27, 2017, Petitioner initiated the present action asserting the issues identified above.

## STANDARD OF REVIEW

Plotts' petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.   The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).   As the Supreme Court

recently emphasized, this standard is "intentionally difficult to meet."  *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (internal quotation omitted).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists."  *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).   The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court.  *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams,* 529 U.S. at 411.   Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.   Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a

legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308.   Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."   While this standard is "demanding" it is "not insatiable."   *Id.* For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007).   This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta."   *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."   *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2).   This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"   *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).   Instead, when a federal claim has

been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85.   Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.*   If this presumption is overcome, however, the Court reviews the matter de novo.  *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.        Ineffective Assistance of Trial Counsel

Petitioner asserts that he is entitled to relief on the ground that he was denied the right to the effective assistance of trial counsel.   Specifically, Petitioner argues that his trial counsels' performance was deficient in the following ways: (1) he failed to object to testimony by Melissa Peterson and Trooper Chris Boven concerning one of the victim's out-of-court statements; (2) he failed to hire an expert witness to explain why the alleged victims would falsely accuse Petitioner of committing sexual assault; and (3) he failed to move to sever Petitioner's joint trial.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).   To establish

16

deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).   A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689).   Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.   Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)); *see also*, *MA.H.di v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).   In the context of a sentencing proceeding, Petitioner must demonstrate that there exists a reasonable probability that, but for counsel's errors, he would have received a more favorable sentence.  *See, e.g., Stumpf v. Robinson*, 722 F.3d 739, 753-54 (6th Cir. 2013) (to prevail on a claim that counsel rendered ineffective assistance at sentencing, petitioner must demonstrate that there exists a reasonable probability that absent counsel's errors he would have received a different sentence).

The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).   This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly

ineffective that defeat was snatched from the hands of probable victory."  *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one."  *Premo*, 562 U.S. at 122.  Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."  Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly deferential.  *Id.* (citations omitted).  As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

A.    Victim's Statements

As noted above, Melissa Peterson and Trooper Chris Boven both testified as to statements made by K.B. concerning her sexual assault allegations.  Petitioner argues that he is entitled to habeas relief on the ground that his trial attorney's failure to object to the introduction of this testimony deprived him of the right to the effective assistance of counsel.  Petitioner explored these matters with his trial counsel at a post-conviction *Ginther* hearing.[1]

---

[1] Hearings at which evidence is presented regarding claims of ineffective assistance of counsel are, in Michigan, referred to as *Ginther* hearings.  *See People v. Ginther*, 390 Mich. 436 (1973).

With respect to Melissa Peterson's testimony, Petitioner's trial counsel testified that he did not discern a basis to object to Peterson's testimony because Peterson was relating statements made during her medical examination of K.B.. (Hearing Transcript, February 14, 2014, at PageID.933-34). The Michigan Court of Appeals found that "Peterson's testimony regarding what K.B. told her in their interview is admissible under the medical treatment exception to hearsay." *Plotts*, 2015 WL 4751154 at *3 (citing Michigan Rule of Evidence 803(4)). As the court concluded, "any objection to Peterson's testimony on hearsay grounds would likely have been overruled, and 'counsel is not ineffective for failing to make a futile objection.'" *Plotts*, 2015 WL 4751154 at *3 (citation omitted). Thus, Petitioner cannot establish that his trial attorney was ineffective for failing to object to Melissa Peterson's testimony.

As for Trooper Boven's testimony, Petitioner's trial counsel testified at the *Ginther* hearing that he made the strategic decision not to object because "the jury wasn't even really paying much attention to the testimony." (Hearing Transcript, February 14, 2014, at PageID.932). Counsel further indicated that he was concerned that an objection would be unsuccessful and would only serve to focus the jury's attention on the testimony in question. (Hearing Transcript, February 14, 2014, at PageID.932).

Instead, counsel cross-examined Boven on the subject of K.B.'s statements. Counsel obtained from Boven a concession that the setting in which he spoke with K.B. was not ideal because of the presence of family members and other distractions. (Trial Transcript, January 3, 2013, at PageID.728-29). Counsel also obtained from Boven the concession that it was difficult for him to gauge K.B.'s truthfulness because the interview occurred in such "a poor setting." (Trial Transcript, January 3, 2013, at PageID.729-30).

19

When cross-examining Melissa Peterson, counsel was able to illustrate for the jury that K.B. made statements to the police which were not consistent with the statements she made to Peterson.   (Trial Transcript, January 3, 2013, at PageID.640-44).   On cross-examination, counsel questioned K.B. about inconsistencies in her testimony and prior statements, obtaining from K.B. an acknowledgment that she had no explanation for such.   (Trial Transcript, January 3, 2013, at PageID.559-71).

The Michigan Court of Appeals rejected this particular claim on the ground that counsel's failure to object to Trooper Boven's testimony was part of a "reasonable trial strategy" the purpose of which was to "demonstrate how K.B.'s statements regarding defendant's alleged abuse changed over time."   *Plotts*, 2015 WL 4751154 at *3 (citation omitted).   Furthermore, as the trial judge observed, in rejecting Petitioner's ineffective assistance of counsel argument, defense counsel "pursued an effective strategy, because Defendant was acquitted of three felony counts" involving both victims.   *See, e.g., Thurmond v. Carlton*, 2012 WL 2866664 at *5 (6th Cir., July 13, 2012) (basing trial strategy on witnesses' inconsistent statements constitutes sound trial strategy); *Smith v. Smith*, 2013 WL 5410125 at *5 (N.D. Ohio, Sept. 26, 2013) (where strategy resulted in acquittal on multiple charges, counsel did not render ineffective assistance).

In sum, the denial of this claim by the Michigan courts was neither contrary to, nor involved an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.

B.    Expert Witness

Petitioner next claims that he is entitled to relief because his trial counsel failed to present evidence from an expert witness to explain why the alleged victims would falsely accuse Petitioner of committing sexual assault.

As the Michigan Court of Appeals observed, "it is undisputed that defendant did not qualify for state funds to hire an expert." *Plotts*, 2015 WL 4751154 at *4.   Thus, this is not a circumstance in which counsel failed to obtain an expert witness due to an inexcusable failure to investigate the amount which the state would contribute to the payment of such.   *See, e.g., Hinton v. Alabama*, 134 S.Ct. 1081 (2014).   This is likewise not a circumstance in which Petitioner's due process rights were violated by the State's failure to provide funds for Petitioner to employ an expert witness.   *See, e.g., Weeks v. Angelone*, 176 F.3d 249, 264-65 (4th Cir. 1999) (recognizing that the Supreme Court's decision in *Ake v. OklA.H.oma*, 470 U.S. 68 (1985) does not compel the State to provide investigators or other non-psychiatric experts).   Thus, the question becomes whether counsel's decision not to present expert testimony was reasonable trial strategy or attributable to some other factor.

As the testimony at the *Ginther* hearing revealed, counsel contacted several expert witnesses, but Petitioner and his family were simply unwilling to pay the cost for their services. Thus, as the Michigan Court of Appeals concluded, "defense counsel's failure to hire an expert did not result from his inadequate investigation into defendant's case, but rather from insufficient funds available to hire an expert."   *Plotts*, 2015 WL 4751154 at *5.

As Petitioner cannot establish deficient performance by his trial counsel, his claim fails.   Thus, the denial of this claim by the Michigan courts was neither contrary to, nor involved

21

an unreasonable application of, clearly established federal law.    Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

C.    Motion to Sever

Finally, Petitioner asserts that his trial counsel was ineffective for failing to seek separate trials concerning the allegations by the two victims.    Under Michigan law, joinder of claims is appropriate for related offenses, a circumstance which is satisfied if the offenses are based on: (1) the same conduct or transaction; (2) a series of connected acts; or (3) a series of acts constituting parts of a single scheme or plan.    *Plotts*, 2015 WL 4751154 at *6.

As the Michigan Court of Appeals concluded, a motion to sever would most likely have been denied because Petitioner's conduct toward the two victims was related as defined by Michigan law.    *Ibid.*    As the court recognized, Petitioner "had a domestic relationship with both girls and abused them when their mothers were at work" and Petitioner "often abused both girls while sitting with them on a couch."    *Ibid.*    It does not constitute deficient performance to fail to assert futile motions or objections.

This matter was also explored at the *Ginther* hearing.    Counsel testified that Petitioner was unwilling to pay the cost of two separate trials.    (Hearing Transcript, February 14, 2014, at PageID.937).    Counsel was also concerned about affording the prosecution two opportunities to convict Petitioner.    (Hearing Transcript, February 14, 2014, at PageID.937-38). This was not an unreasonable concern, especially considering that prior to trial Petitioner admitted to his attorney that he was guilty of the charges against him.    (Hearing Transcript, February 14, 2014, at PageID.942-43).

22

In sum, Petitioner cannot satisfy either prong of the *Strickland* standard as to this claim.   Accordingly, the denial of this claim by the Michigan courts was neither contrary to, nor involved an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Plotts' petition for writ of habeas corpus be **denied**.   The undersigned further recommends that a certificate of appealability be denied.   *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.   28 U.S.C. § 636(b)(1)(C).   Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: April 6, 2018                                             /s/ Ellen S. Carmody
                                                              ELLEN S. CARMODY
                                                              United States Magistrate Judge